UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| ANTANIA WATSON, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 3:15-CV-00488-JD |
| STATE OF INDIANA DEPARTMENT OF CORRECTION, | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

Antania Watson filed this action alleging that the State of Indiana Department of Correction (IDOC) discriminated against her on the basis of her race and sex when it terminated her employment as a corrections officer. Upon the close of discovery, IDOC moved for summary judgment, arguing that neither Ms. Watson's race nor her sex contributed to the decision to fire her. For the following reasons, the Court grants the motion for summary judgment.

## I. FACTUAL BACKGROUND

Ms. Watson applied for employment with IDOC as a correctional officer at Indiana State Prison in November 2014. A mandatory pre-interview questionnaire required Ms. Watson to indicate whether she had any known relatives incarcerated in the IDOC. In response, Ms. Watson indicated that she had a sibling named "Victor Blissitt" incarcerated at either Indiana State Prison or Westville Correctional Facility. Ms. Watson also indicated on the same questionnaire that she had previously visited an IDOC inmate, against listing an individual by the name of "Victor Blissitt." Ms. Watson was hired by IDOC and subsequently began attending the required training for new correctional officers.

On December 11, 2014, the training class covered the topic of trafficking contraband in prison. During a break from the training several of the students were discussing that topic. Ms. Watson allegedly made several comments that her classmates found concerning and reported to Internal Affairs. The reports, submitted by four of her classmates, alleged that Ms. Watson "stated that she knew of offenders who had cell phones in [Indiana State Prison]," that "she believed if she were to traffic, inmates would not snitch on her, they only snitch on other offenders," and that "trafficking isn't really a big deal." [DE 97-2 at 10-15].

Those reports were forwarded to the warden of Indiana State Prison, who instructed Internal Affairs to investigate. Specifically, the warden emailed two Internal Affairs investigators stating "I'd like this employee seriously interviewed before she begins on shift. If this is true, I don't want her and would like to cut our losses but I need something more than the three staff witness statements." [DE 92-15 at 2]. Ms. Watson was interviewed by Internal Affairs on December 15, 2014. Ms. Watson denied making the statements in question and denied knowing any inmates who had cellphones. She also said that she believed her classmates were stereotyping her as someone prone to trafficking with offenders because "she is cute" and "offenders will 'hit' on her." [DE 92-15 at 1]. In a statement written after the interview, Ms. Watson indicated that she believed she may have been "misinterpreted" and that her classmates' reports were motivated by their stereotype of her being likely to engage in trafficking because, as a female, she would be an easy target for manipulation by offenders. [DE 97-2 at 7].

During the December 15 interview, the investigators also questioned Ms. Watson about the sibling listed on her job application. Ms. Watson said her brother's name was "Victor Blissitt" and that he was incarcerated at either Indiana State Prison or Westville Correctional Facility, and that she last visited him in 2012. While Ms. Watson was writing her statement after

2

the interview, the investigators found a visitation application dated July 11, 2009, showing that Ms. Watson had visited "Victor Crews" at Indiana State Prison. The application was signed by Ms. Watson and stated that she was his sister. Visitation records showed that Ms. Watson visited Crews at Indiana State Prison four times between 2010 and 2012. Upon discovering that information, one of the investigators asked Ms. Watson "who Offender Crews was." [DE 92-2]. She replied that she did not know. He asked her again whether she knew who Crews was, and she replied "no." *Id.* Records further showed that Crews was suspected of trafficking cell phones into the facility and had recently been found in possession of a contraband cell phone.

The Internal Affairs investigators concluded their investigation at that point. They concluded that they were unable to substantiate the initial reports about Ms. Watson's statements about trafficking. However, they concluded that Ms. Watson had falsified her employment application and failed to fully disclose her relationship to an inmate, as she identified her brother as Victor Blissitt and denied knowing Crews. On December 18, 2014, the warden met with Ms. Watson and terminated her employment. The termination letter stated that Ms. Watson was fired because her "actions [did] not meet agency standards and [were] unacceptable." [DE 92-3]. The warden asserts that he terminated Ms. Watson's employment "because she failed to disclose in her employment application that her brother, Victor Crews, is incarcerated at [Indiana State Prison]." [DE 92-1]. He asserted that he would terminate the employment of any correctional officer who failed to fully disclose the identity of a family member incarcerated at the facility, since that not only demonstrates dishonesty, but may also suggest an improper motive.

Ms. Watson later filed this suit against IDOC. She initially represented herself, but the Court granted her motion to recruit counsel, so she is now ably represented. Discovery has closed, and IDOC moved for summary judgment.

3

## II. STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations contained in its pleadings but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## III. DISCUSSION

Ms. Watson's complaint suggested that she was asserting claims for race and sex discrimination in violation of Title VII. The Indiana Department of Correction moved for summary judgment on both claims. In response, Ms. Watson only defends her claim for sex discrimination. The Court thus construes her as abandoning any claim for race discrimination. For many of the same reasons discussed below, though, the record contains no evidence to

support a claim for race discrimination, so summary judgment would be warranted on the merits as well.

Title VII prohibits an employer from discriminating based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A Title VII claim requires a plaintiff to show (1) they are a member of a class protected by the statute; (2) they have experienced an adverse employment action; and (3) the employer took this adverse action because of the plaintiff's membership in the protected class. *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018). The parties do not dispute that Ms. Watson is a member of a protected class and that she was subject to an adverse employment action when she was fired by IDOC. The only question remaining is whether a reasonable factfinder could conclude that Ms. Watson's sex caused the termination.

The *McDonnell Douglas* framework provides one method of organizing and assessing evidence of discrimination, and both of the parties here use that framework to structure their arguments. The Court thus begins its analysis with the *McDonnell Douglas* framework, before considering whether the evidence as a whole could permit an inference of discrimination. *David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("Because the *McDonnell Douglas* framework survived *Ortiz*, and because Ms. David has presented her argument in those terms, we will begin our assessment of the evidence by employing that construct and addressing first whether Ms. David has established a prima facie case of discrimination. We will then, however, assess cumulatively all the evidence presented by Ms. David . . . ."). Under the *McDonnell Douglas* framework, Ms. Watson must first show that (1) she is a member of a protected class; (2) she performed her job to IDOC's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated

5

individuals outside of her protected class received better treatment. *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 629 (7th Cir. 2018) (citing *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.,* 860 F.3d 494, 500 (7th Cir. 2017)). The burden then shifts to IDOC to present a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If IDOC does so, then the burden shifts back to Ms. Watson to present evidence that the reason proffered by IDOC was a pretext. *Id.*

Ms. Watson satisfies the first and third elements of the prima facie case, as she is a member of a protected class as a female, and she suffered an adverse employment action when she was fired. However, she has not shown that similarly situated employees outside of her protected class received better treatment. The similarly situated inquiry is "flexible" and "common-sense," *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012), but does require that the similarly situated employees be "directly comparable to the plaintiff in all material respects." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (internal quotations omitted). This usually requires a showing that the comparators (1) "dealt with the same supervisor;" (2) "were subject to the same standards;" and (3) "*engaged in similar conduct* without such differentiating or mitigating circumstances as would distinguish their conduct to the employer's treatment of them." *Coleman*, 667 F.3d at 847 (*quoting Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)) (emphasis added). While the conduct need not be the same, it does need to be similar. *See Patterson*, 589 F.3d at 366 (this third element requires a "showing that coworkers engaged in comparable rule or policy violations"). In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision. *Coleman*, 667 F.3d at 841.

The employees Ms. Watson offers as comparators are the classmates who reported her comments about trafficking to Internal Affairs. She argues that those individuals engaged in similar conduct because, during her interview with Internal Affairs, she said that those individuals might have believed she would engage in trafficking based on stereotypes because she was a young, black female from Gary. Ms. Watson argues that those comparators were treated better than her because, despite her accusation of stereotyping, they were not investigated.

Those facts could not support a conclusion that those individuals were similarly situated to Ms. Watson, as the conduct is far too dissimilar. Ms. Watson was interviewed after multiple individuals wrote statements reporting that Ms. Watson said she knew of inmates who had cell phones in the prison. During the interview, Ms. Watson was asked about who her brother was and where he was located, and she identified her brother as "Victor Blissitt" and said she did not know where he was located. Following that interview, the investigator twice asked her who "Offender Crews" was. She denied knowledge both times. Yet not only was Crews her brother, she had signed a visitation application using that name and had visited him at the same facility she was hired to work at. In comparison, the only information that might have prompted an investigation into the comparators was Ms. Watson's speculation during her interview that they relied on stereotypes in believing that she would engage in trafficking.[1] When asked why she believed that, Ms. Watson offered no explanation. That unsupported speculation about her classmates does not compare to Ms. Watson's failure to disclose her relationship to Crews. Thus,

---

[1] Ms. Watson also refers in passing to another incident between the interview and when she was fired. Ms. Watson alleged that one of her classmates told her he loved her, to which she responded by calling him a "snitch." The instructor told both of them that any discussions unrelated to the job should not be happening. Ms. Watson offers no explanation for why any further response was called for, or how that incident bears any relation to her firing.

the investigators' failure to interview the classmates in response to Ms. Watson's statements does not suggest that Ms. Watson's sex is the reason they interviewed her and terminated her employment.[2]

Moreover, even if Ms. Watson had established a prima facie case, she has not offered evidence that IDOC's proffered reason for her termination was pretextual. The pretext analysis evaluates the "honesty" of an employer's given explanation for the employment action—not the "validity" or "reasonableness" of the explanation. *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Koty v. DuPage Cty., Ill.*, 900 F.3d 515, 519 (7th Cir. 2018); *see also Silverman v. Bd. of Educ.*, 637 F.3d 729, 738 (7th Cir. 2011) (holding that it is not courts' province to decide whether the employer's explanation is "wise, fair, or even correct, . . . so long as it truly was the reason for the plaintiff's termination") (overruled on other grounds). So long as the employer believes the explanation given for the employment action, then pretext has not been shown. *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016).

Ms. Watson has not created a genuine dispute as to whether IDOC's reason for firing her was pretextual. There is no dispute that failing to truthfully disclose the identity of a family member at a correctional officer's facility would be grounds for termination. And the information available to IDOC indicated that Ms. Watson did exactly that.[3] She identified her brother as Victor "Blissitt," both in her application and during the interview, and when asked

---

[2] Moreover, those comparators include one female and three males. Ms. Watson argues that all of those comparators, including the female, were treated better than her, in which case her sex would not explain the disparity.

[3] For that reason, Ms. Watson has also failed to establish that she met her employer's legitimate expectations, which is another element of the prima facie case.

8

directly who "Offender Crews" was, she twice said she did not know. Yet she had previously signed a visitation application to visit Victor "Crews" at Indiana State Prison, and that form stated that she was his sister.

Mr. Watson now attempts to offer innocent explanations for those contradictions. For example, she states that, when they were growing up, her brother went by Victor Blissitt (their mother's name) rather than Crews (his father's name), which is why she identified her brother by that name. She also states that her mother filled out the visitation application for her, and that she just signed it. That information was not known to IDOC at the time, though, so it cannot establish pretext. *Massey v. Johnson*, 457 F.3d 711, 719 (7th Cir. 2006) (holding that, without evidence that the decisionmaker was aware of them, the plaintiff's "post hoc explanations for his conduct . . . does nothing to undermine the sincerity of [the decisionmaker's] reasons for firing him"); *see also Harden v. Marion Cty. Sheriff's Dept.*, 799 F.3d 857, 864 (7th Cir. 2015) ("[F]aulty reasoning or mistaken judgment on the part of the employer is not sufficient to show pretext." (quotation omitted)).

Ms. Watson also argues that the investigation was pretextual because the investigator did not seek out other information that could have explained the inconsistency. The Court disagrees. After finding the visitation application, the investigator asked her directly who Offender Crews was. She twice denied knowing who he was, even though her signature appeared on the application to visit him under that name. That patent inconsistency plainly supports the investigator's conclusion. His failure to further confront her with the visitation form falls well short of suggesting that the investigation was only a sham. *Harden*, 799 F.3d at 864 (noting that in a typical "sham investigation," the investigators "fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome"). Ms. Watson was

the only relevant witness and he asked her point blank who Crews was, and her response was contradicted by documentary evidence.

Ms. Watson also argues that the warden's email directing the investigator to interview her was really just an instruction to find any reason to fire her. The email does not support that interpretation, though. The warden stated that he would not want Ms. Watson *if* the allegations against her about trafficking were true, and that he wanted more information before acting: "I'd like this employee seriously interviewed before she begins on shift. If this is true, I don't want her and would like to cut our losses but I need something more than the three staff witness statements." [DE 92-15]. If the warden had already decided at that point to fire Ms. Watson, he could have relied on the multiple written statements by staff members; directing an investigator to question Ms. Watson first does not indicate that the investigation was pretextual.

Finally, even viewing the evidence outside the confines of the *McDonnell Douglas* framework, Ms. Watson has not offered evidence that, viewed as a whole, permits an inference of discrimination. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Simply put, Ms. Watson has offered no evidence that her sex had anything to do with her firing. She has not identified any other employees who failed to disclose their relationship to an inmate, or committed any similar misconduct, yet were not fired. And even if Ms. Watson was right that the warden wanted her to be fired once he received the reports of her alleged statements about trafficking, nothing suggests that he wanted her fired *because of her sex*, which is the relevant question. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). Ms. Watson also testified that she was fired based on stereotypes, but she offers no evidence to support that belief, and a plaintiff's speculation about a decisionmaker's state of mind will not defeat summary judgment. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 461 (7th Cir. 2014) (holding that "speculat[ion] as to

the employer's state of mind" is not sufficient to defeat summary judgment); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). Accordingly, the Court concludes that a reasonable jury could not infer that Ms. Watson was fired because of her sex. Summary judgment in favor of IDOC is thus warranted.

## IV. CONCLUSION

For those reasons, the Court GRANTS IDOC's motion for summary judgment. [DE 90]. The Clerk is DIRECTED to enter judgment accordingly in favor of the defendant.

SO ORDERED.

ENTERED: February 20, 2019

/s/ JON E. DEGUILIO<br>
Judge<br>
United States District Court